IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| Drayton Grain Processors, a North Dakota cooperative association, | ) ) ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| vs. | ) | **DENYING MOTION TO DISMISS** |
| | ) | |
| NE Foods, Inc. and Robert S. Miller, as successors to NE Foods, LLC, | ) ) | Civil File No. 3:05-cv-73 |
| | ) | |
| Defendants. | ) | |

Before this Court is Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) for lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a cause of action (doc. #10).

**SUMMARY OF DECISION**

Personal jurisdiction is proper over Miller based on his contacts with the State of North Dakota.  NE Foods, Inc., as the successor to NE Foods, LLC, also has sufficient minimum contacts to  jurisdiction.  The Court further finds that Defendants have waived any right to arbitration and that Plaintiff has standing to bring the instant suit.

**FACTUAL BACKGROUND**

Plaintiff Drayton Grain Processors ("DGP") is a North Dakota cooperative consisting of more than 200 farmers from Eastern North Dakota and Northwestern Minnesota.  The cooperative was formed in the mid-1990's for the purpose of establishing a value-added enterprise, namely the production of frozen dough.  This cooperative, named Drayton Foods,

would serve as an additional market for the constituent farmers' wheat. The wheat could be converted in flour, and eventually transformed into a frozen dough product.

DGP managed to raise $4 million from its individual members to fund Drayton Foods. The cooperative owned 40% of Drayton Foods, with the remaining 60% owned by a management team, which included Terry Smith and Tom Caron. Smith had experience in large-scale baking and Caron was a retired executive of Schwan's Foods, a major supplier of frozen meals to individual residences. The frozen dough industry proved to be more competitive and less profitable than the farmer's previously thought. Drayton Foods sought to explore a new process, that of "pre-proofed" dough. This dough is found in frozen pizzas and similar products. This self-rising dough, while common today, was fairly unique at this time. In order to raise capital to fund this venture into pre-proofed dough production, Caron sought investment from Robert Miller, an individual. Miller is East Coast based manufacturer of bread and frozen dough products. His initial investment was for $300,000 and was contributed through an entity known as Red River Management, LLC ("RRM"). RRM, in turn, became the manager of a new entity called Drayton Enterprises, LLC. Miller's investment made him part owner of Drayton Enterprises, part of the managing entity, and gave him a seat on the board of managers. Drayton Enterprises took on Schwan's Foods as an additional partner. Schwan's, through a series of large investments, eventually came to hold 67 percent of Drayton Enterprises, leaving the DGP with 25 percent and RRM with 8 percent.

By summer of 1999, Schwan's sought to sell its interest in Drayton Enterprises, seeking $3.5 million for its 67 percent share of ownership. Miller, interested in the purchase, sent out employees Richard Steele and Bob Wasko to conduct due diligence on the manufacturing

2

facilities and production records.  Miller made his investment contingent on several additional demands, which required the acquiescence of both DGP and the management team.  These concessions included the right for Miller to "call" or buy out the interests of both DGP and the management team in a little more than three years after the restructure.  DGP and the management team agreed to these demands.  Miller's investment gave him and his company, NE Foods, LLC a majority interest, with DGP retaining a 25 percent share.

Miller's majority stake allowed him control of a majority of the Drayton Enterprises' board of managers.  Miller held a seat as did, at times, his son, Steele and Wasko.  DGP alleges that over the next few years Drayton Enterprises expanded at the expense of current net profit.  Drayton further made several decisions that benefitted the long-term health of the company, but had a significantly negative impact on the interests of the DGP.  DGP further states that Miller's decisions went unchallenged by the farmers because they believed Miller understood and appreciated the fact that they were "long-term" investors.  Miller would eventually exercise his call option at the earliest possible date, April 1, 2003.

The outside auditors of Drayton Enterprises were directed to compute a purchase price based on a formula in the Option Agreement.  DGP disagreed with the outside auditors calculation and filed a claim with the American Arbitration Association in April of 2003.  The farmers additionally sought redress of Miller's alleged breach of his fiduciary duty as majority owner stemming from duties owed under the LLC Agreement.  The arbitration hearing was conducted over four days in June of 2003 in Fargo, North Dakota.  Miller flew to Fargo and attended all four days of the arbitration meeting.  During the arbitration, NE Foods, LLC sought to separate DGP's claims for breaches of fiduciary duty, which were based on the LLC

Agreement, from DGP's dispute over the correct purchase price, which was borne out upon of the Option Agreement. The arbitrator, upon NE Foods' motion, limited the scope of the arbitration to only the Option Agreement, and dismissed the fiduciary duty claim without prejudice. The arbitrator further directed, again on NE Foods' motion, that DGP immediately transfer its full interest in Drayton Enterprises to Miller. In exchange, DGP received a 25 percent down payment, with the balance to be paid over the course of four years pursuant to unsecured notes.

On July 21, 2004, the arbitrator issued an award for DGP, finding that DGP was entitled to additional sums based upon errors in the computation of the option price. The arbitrator stated that the arbitration proceeding and award were without prejudice to DGP's separate fiduciary duty claim, based on the LLC Agreement, which had previously been dismissed. Following this award, NE Foods, LLC issued another unsecured promissory note in October 2004. This note provided a down payment with the balance payable over time, with a final payment due in December of 2007.

Less than two months after the Arbitrator's award, and without notice to DGP, NE Foods, LLC would be dissolved. NE Foods, Inc. filed a certificate with the Delaware Secretary of State stating it was the sole member of NE Foods, LLC, and further represented that the business of NE Foods, LLC had been wound up in accordance with Delaware law. Plaintiff argues that there were no provisions made as to whether Miller or NE Foods, Inc. would assume the role of obligor under the promissory notes, and similarly no provisions as to who would assume responsibility under the LLC agreement in regards to DGP's breach of duty claims. This suit followed.

## ANALYSIS

### Personal Jurisdiction

<u>Legal Standard</u>

Defendant moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), alleging that this Court lacks personal jurisdiction over Robert Miller and NE Foods, Inc. At this stage of the proceedings, Plaintiff needs only to establish a prima facie case of personal jurisdiction over the defendants in order to survive a motion to dismiss. <u>Digi-Tel Holdings v. Proteq Telecom</u>, 89 F.3d 519, 532 (8th Cir. 1996). When considering a motion to dismiss, the pleadings are to be construed in the light most favorable to the non-moving party, and the facts alleged in the complaint are to be take as true. <u>Hamm v. Groose</u>, 15 F.3d 110, 112 (8th Cir. 1994). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the non-moving party. <u>Dakota Indus., Inc. v. Dakota Sportswear, Inc.</u>, 946 F.2d 1384, 1387 (8th Cir. 1991).

A Court may properly exercise personal jurisdiction over a party if a two-step inquiry is satisfied. First, the party must be "amenable to service of process under the appropriate long-arm statute." <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945). Secondly, the activities of the non-consenting party must "satisfy the minimum contacts requirement of the Due Process Clause." <u>Id.</u> The scope of North Dakota's long-arm jurisdiction is set forth in Rule 4(b)(2) of the North Dakota Rules of Civil Procedure. The North Dakota Supreme Court has interpreted this statute to be co-extensive with the limits of due process. <u>Hanson v. Scott</u>, 645 N.W.2d 223, 230 (N.D. 2003); <u>Hebron Brick Co. v. Robinson Brick and Tile Co.</u>, 234 N.W.2d 250, 255-56 (N.D. 1975). Thus, the two step-inquiry merges into a single question: whether the Court's

exercise of personal jurisdiction over Miller and NE Foods, Inc. would violate due process. RDO Foods Co. v. United Brands Int'l Inc., 194 F. Supp. 2d 962, 967 (D.N.D. 2002).

A state's jurisdiction over a non-consenting party does not offend due process if the party has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe, 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  These minimum contacts must be sufficient to allow the non-consenting party "[to] reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 44 U.S. 286, 297 (1980).  The Eighth Circuit has articulated a five-part test for determining the sufficiency of a defendant's contacts: "(1) the nature and quality of contacts within the forum state; (2) the quantity of such contact; (3) the relation of the cause of action to the contact; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 648 (8th Cir. 2003).  The Court separately analyses the contacts of Miller and NE Foods, Inc.

### Miller

While it is not disputed that Miller has contacts with the state of North Dakota, he contends that he is not subject to the jurisdiction of this Court because all of his contacts have been in the capacity as an officer for various corporate entities.  Miller argues that this status nullifies any contacts that would otherwise confer jurisdiction. Arkansas Rice Growers Coop. Assoc. v. Alchemy Indust., Inc., 797 F.2d 565, 574 (8th Cir. 1986).  This principle is known as the "fiduciary shield" or "corporate shield" doctrine. Int'l Adm'rs Inc. v. Pettigrew, 430 F. Supp.

2d 890, 898-99 (S.D. Iowa 2006); Pet Quarters, Inc. v. Badian, 2006 U.S. District LEXIS 59372 at *11 (E.D. Ark. August 7, 2006).  The Supreme Court, however, has held that the state-created corporate identity does not serve to confer any additional due process protections to corporate employees above and beyond the traditional minimum contacts inquiry.  Calder v. Jones, 465 U.S. 783, 790 (1984) ("[Petitioners'] status as employees does not somehow insulate them from jurisdiction.  Each defendant's contacts with the forum state must be assessed individually") (citations omitted); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.3 (1984) ("...we today reject the suggestion that employees that act in their official capacity are somehow shielded from suit in their individual capacity.").  Because corporate officers do not enjoy any special constitutional jurisdictional immunity, any additional protection stemming from the corporate form must arise out of state law, if at all.  Other states in this circuit have addressed whether their respective long-arm statutes provide a jurisdictional shield to corporate officers.  Residential Funding Corp. v. Anvil Funding Corp., 2005 U.S. District LEXIS 42279 at *17 (D. Minn. June 3, 2005) (rejecting fiduciary shield doctrine); Cantrell v. Extradition Corp. of America, 789 F. Supp 306, 310 (W.D. Mo. 1992) (rejecting corporate shield doctrine); Crystal Clear Optical, Inc., v. Silver, 531 N.W.2d 535, 539-40 (Neb. 1995) (same); Torchmarck Corp. v. Rice, 945 F. Supp. 172, 176 (E.D. Ark. 1996) (same).  But see State ex rel Miller v. Baxter Chrysler Plymouth Inc., 456 N.W.2d 371, 377-78 (Iowa 1990) (applying corporate shield doctrine).

     North Dakota courts have not heretofore addressed whether the corporate shield doctrine is recognized in this state.  However, upon examination of North Dakota's long-arm statute, this Court is convinced that it is not.  North Dakota's long-arm statute, Rule 4(b)(2), indicates that the legislature contemplated, and accepted, the notion of exercising personal jurisdiction over

individuals acting in an official or corporate capacity. Rule 4(b)(2) expressly provides for jurisdiction over a defendant whose contact with the state is based on "acting as a director, manager, trustee, or officer of a corporation organized under the laws of, or having its principal place of business within, this state." N.D. R. Civ. P. 4(b)(2)(G). Miller served as chairman and president of Drayton Enterprises, a corporation with its chief place of business in North Dakota. Rule 4(b)(2) is therefore applicable, and the Court's only remaining inquiry is whether Miller enjoyed "minimum contacts" with the state of North Dakota. RDO Foods, 194 F. Supp. 2d at 967. The Court should not impute Drayton's contacts to Miller, but rather should assess the Defendant's contacts on an individualized basis. Keeton, 465 U.S. at 781 n.13.

This Court is satisfied that Miller's contacts with the state are sufficient to satisfy Due Process. Miller traveled to North Dakota to discuss and negotiate his initial $300,000 investment into Drayton Enterprises. Miller sat on the board of managers of Drayton and attended regular business meetings in the state. He also attended North Dakota meetings of NE Foods, LLC, the company that would eventually own a majority interest in Drayton. Miller further attended all four days of the Fargo arbitration, where he testified. These repeated contacts with the state would give Miller adequate notice that he could potentially be subject to suit within the state. Due process and Rule 4(b)(2) are thus satisfied, and this Court may properly exercise jurisdiction over Miller.

### NE Foods, Inc.

Ordinarily, a corporation purchasing the assets of another company does not assume the liabilities of the purchased company. Keller v. Clark Equip. Co., 715 F.2d 1280,1289 (8th Cir.

1983); Downtowner, Inc. v. Acrometal Products, Inc., 347 N.W.2d 118, 121 (N.D. 1984). Exceptions to this general principle exist, however, when: (1) there is an express or implied agreement to assume the transferor's liabilities, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the transferee corporation is merely a continuation of the transferor corporation, or (4) the transaction is an attempt to defraud the creditors of the corporation. Downtowner, 347 N.W.2d at 121; Lyon v. Southern Gas Co., (In re Wright Enters.), 77 Fed. Appx., 356, 368-69 (6th Cir. 2003); Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1456 (11th Cir. 1985); Leannais v. Cinncinnati, Inc., 565 F.2d 437, 439 (7th Cir. 1977); Acheson v. Falstaff Brewing Corp., 523 F.2d 1327, 1329 (9th Cir. 1975); Cyr v. B. Offen & Co., Inc., 501 F.2d 1145, 1152 (1st Cir. 1974).

The Court finds NE Foods, Inc. Can be categorized as a successor under any one of the above exceptions. In examining the first exception, the Court observes that Defendants made payments to Plaintiff on the unsecured notes. While no legal entity has expressly assumed responsibility for payment on the two notes, Plaintiff has received checks from both NE Foods, Inc. and Better Baked. Better Baked is wholly owned by NE Foods, Inc. Conduct or representations of the transferor can be a sufficient basis for finding implied liability. Weldon v. Great White North Distrib. Serv., LLC, 197 F. Supp.2d 893, 900 (E.D. Mich. 2002); Carter Enters. v. Ashland Specialty Co., 142001 U.S. District LEXIS 3561 at *14 (S.D. W.Va. Jan. 31, 2001); Ladjevardian v. Laidlaw-Coggeshall, 431 F. Supp. 834, 839 (S.D.N.Y. 1977). Here, the payments made by NE Foods, Inc. to Plaintiff for the debts of NE Foods, LLC is sufficient to show an assumption of the latter's obligations.

The second exception applies when the transaction amounts to a consolidation or merger

9

between the entities.  Here, NE Foods, Inc. was the sole owner of NE Foods, LLC.  The transfer of NE Foods, LLC's interest in Drayton Enterprises to NE Foods, Inc. was, for all practical purposes, a consolidation of NE Foods, Inc.'s control over Drayton.

The third exception is equally applicable.  At this stage of the litigation, the evidence suggests that NE Foods, LLC served as a mere avatar of NE Foods, Inc., if not Robert Miller himself.  NE Foods, LLC owned 100 percent of Drayton Enterprises, and NE Foods, Inc. owned 100 percent of NE Foods, LLC.  Miller admitted in deposition that he was the owner of NE Foods, LLC.  As NE Foods, LLC was wholly owned by NE Foods, Inc., this would mean that Miller was the owner of NE Foods, Inc. as well.  Moreover, Miller is not the only individual that held officer or director positions in both enterprises.  Richard Steele, who had conducted the original due diligence as an employee of Miller, served as Vice President and Secretary of NE Foods, LLC, and is presently an officer with NE Foods, Inc.  Based on the closely held nature of the various firms, and the continuity of the leadership, this Court concludes that NE Foods, Inc. is merely a continuation of the transferee corporation, NE Foods, LLC.

The fourth exception, however, provides the strongest rationale for the imposition of successor liability.  NE Foods Inc. was the sole member of NE Foods, LLC at the time of the latter's dissolution.  NE Foods, Inc. was required as part of the "winding up" process to "make such provisions as will be reasonably be likely to be sufficient to provide compensation for claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within 10 years after the date of dissolution."  6 Del. Sta. 18-804(b)(3).  NE Foods, Inc. informed to the Delaware Secretary of State that the reasonable

provisions had been made for both known obligations and anticipated liabilities. NE Foods, LLC, made such a representation fully aware that DGP sought resolution of its fiduciary duty claim. NE Foods, LLC knew such because it had rebuffed DGP's attempts to mediate or even negotiate the issue, and would also structure the arbitration proceeding so as to have these claims dismissed. Nevertheless, Richard Steele, the Vice President and Secretary of NE Foods, Inc., and former and officer of NE Foods, LLC, has indicated to this court that:

> Reasonable provisions were made at the time of dissolution to pay the known, existing, and reasonable anticipated liabilities of NEF LLC (NE Foods, LLC), including the payment due DGP under the promissory notes. Those payments continue to be made to DGP.

The Court is troubled by this assertion, as NE Foods, LLC, with knowledge that DGP sought to enforce its fiduciary duty claim, wound up operations without providing notification to DGP. The dissolution occurred only a few months after arbitration was complete. The argument that Defendants stood ready and willing to address DGP's legal claim is simply incredible. Defendants have instead manipulated the corporate form in order to evade forthcoming legal action from those whom they owed a fiduciary duty. The present motion to dismiss is merely a continuation of such behavior.

      The Court finds that there is sufficient evidence at this stage to find that NE Foods, Inc. is the successor to NE Foods, LLC. As successor, jurisdiction over NE Foods, Inc. is therefore proper based upon NE Foods, Inc.'s ownership of Drayton Enterprises, general principles of successorship, and North Dakota state law as set forth in <u>Downtowner</u>. NE Foods, Inc. was the sole member of NE Foods, LLC at the time of the latter's dissolution. NE Foods, LLC, in turn, was the sole owner of Drayton Enterprises. Drayton operated a manufacturing plant in Fargo, which employed more than 170 people. The Court concludes that NE Foods, Inc. has sufficient

contacts to justify the exercise of jurisdiction in the present case.  See also Williams v. Bowman Livestock Equip Co., 927 F.2d 1128, 1132 (10th Cir. 1991) (Personal jurisdiction over a corporate successor may be based on predecessor's contacts with forum, provided successor would be liable for predecessor's acts under forum law); City of Richmond v. Madison Mgmt. Group, 918 F.2d 438, 454 (4th Cir. 1990); Duris v. Erato Shipping, Inc., 684 F.2d 352, 356 (6th Cir. 1982).

### Arbitration Provision of the LLC Agreement

Defendants additionally move to dismiss the present action under the theory that this court lacks subject matter jurisdiction.  Defendants contend that if Miller and NE Foods, Inc. are deemed successors to NE Foods, LLC, and thus bound by the LLC Agreement, the parties are bound to follow the dispute resolution protocols set forth in sections 17.15 and 17.16 of the Agreement.  This procedure includes a general progression from good faith negotiation, to non-binding mediation, to arbitration.  As such, Defendants argue that this Court lacks jurisdiction over the present case.

Plaintiff suggests, and this Court agrees, that Defendants have waived this right.  A contractual right to arbitration can be waived, either expressly or impliedly. Burton-Dixie Corp., v. Timothy McCarthy Constr. Co., 436 F.2d 405 (5th Cir. 1971).  Because of the strong federal policy favoring arbitration, disputes concerning waiver of an arbitration provision, should generally be resolved in favor of arbitration.  Ritzel Communications v. Mid-American Celluar, 989 F.2d 966, 968-69 (8th Cir. 1993).  Nevertheless, the Eighth Circuit has stated waiver exists where the party claiming the right to arbitrate (1) knew of its existing right to arbitration, (2)

acted inconsistently with that right, (3) and prejudiced the other party by its inconsistent actions. Dumont v. Saskatchewan Gov't Ins., 258 F.3d 880, 886 (8th Cir. 2001) (citing Ritzel, 989 F.2d at 968-69). Whether inconsistent acts constitute prejudice is a case by case determination. Stifel, Nicolaus & Co. v. Freeman, 924 F.2d257, 159 (8th Cir. 1991).

  Here, the Defendant clearly knew of its right to arbitrate. Defendants have previously engaged in arbitration with Plaintiffs. During the course of the proceeding, Defendants successfully moved to have the fiduciary duty claim excised from the arbitration proceeding. The arbitrator's July 21, 2004 award specifically informed Defendants that the award was without prejudice to the fiduciary duty claims. It cannot therefore be denied that Defendants were unaware of their right to engage in arbitration. Further, Plaintiff contends that it followed the proper procedures set forth in the LLC Agreement. DGP states that it sought negotiation and mediation before filing a claim, but all such requests were refused by Miller through his attorney. Certainly this constitutes an inconsistent act. The fact that Plaintiff had to incur the expenses of litigation and suffer years of delay to pursue the present claim is sufficient to constitute prejudice. Thus, the Court finds that Defendants have waived their right to arbitration in the present matter.

**Standing**

  Defendants lastly contend that DGP lacks standing because it transferred its rights under the LLC Agreement during the June 2003 arbitration proceeding. Plaintiff transferred its membership interest on December 31, 2003 pursuant to the arbitrator's December 23, 2003 order, which granted a request for specific performance. This order, however, also stated that

the transfer was without prejudice to DGP's right to bring a separate claim arising out of the LLC Agreement at a later date.  This transfer, which NE Foods, Inc. accepted, read in part: "Drayton Grain Processors reserves the right as to issues raised in the arbitration, under the Limited Liability Agreement dated effective January 1, 2000, and under Delaware law."  The sole reason these claims were not resolved at this earlier date was because Defendants sought to have them reserved for future adjudication.  Defendants now attempt to exploit this act for the purpose of evading legal liability.  As Defendants accepted the transfer of DGP's membership interest with the understanding that DGP's claims were preserved, Miller and NE Foods, Inc. are now estopped from asserting otherwise.

Defendants additionally argue that this Court must first determine the legal effect of DGP's assignment, citing  I.S. Joseph Co., Inc. v. Michigan Sugar Co., 803 F.2d 396 (8th Cir. 1986).  I.S. Joseph merely holds that this Court must determine whether an assignee may validly assert an arbitration clause.  Id.  at 400.  Defendant analogizes the case to the present matter, arguing that I.S. Joseph should be read to mean the Court must determine the legal effect of DGP's transfer, namely whether Plaintiff lacks standing to assert its fiduciary duty claim.  Aside from the glaring factual differences between I.S. Joseph and the present case, the opinion is of limited use as this Court has already determined that the Plaintiff may proceed with its fiduciary duty claim and that Defendants are barred by the principle of estoppel.

## CONCLUSION

Defendants' Motion to Dismiss (doc. #10) is **DENIED** in its entirety.

**IT IS SO ORDERED**.

Dated this 30th day of March, 2007.

                                           /s/  Ralph R. Erickson
                                      Ralph R. Erickson, District Judge
                                      United States District Court